**Benjamin P. Davis**
California Bar No. 275918
**Federal Defenders of San Diego, Inc.**
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
Benjamin_Davis@fd.org

Attorneys for Juan Carlos Cabrera

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

**(HONORABLE LARRY A. BURNS)**

| | | |
|---|---|---|
| **United States of America,** | ) | Case No: 20cr-0435-LAB |
| | ) | 15cr-0353-LAB |
| Plaintiff, | ) | |
| vs. | ) | **Mr. Cabrera's Sentencing** |
| | ) | **Memorandum** |
| **Juan Carlos Cabrera,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**To:** **Randy Grossman,** Acting United States Attorney,
**Colin M. McDonald,** Assistant United States Attorney, and
**Amanda T. Muskat,** Assistant United States Attorney:

The defendant Juan Carlos Cabrera, by and through his counsel, Benjamin P. Davis and Federal Defenders of San Diego, Inc., hereby files his Sentencing Memorandum respectfully requesting that the Court impose a **total sentence of 27 months in prison.**

//

//

# I.
## Procedural Background

Mr. Cabrera was arrested on November 3, 2019, between the border fences near the ocean. A jury convicted him on June 9, 2021, of two counts: felony attempted illegal entry under 8 U.S.C. § 1325, and attempted illegal re-entry after removal under 8 U.S.C. § 1326(a) and (b). A Pre-Sentence Report was filed on August 23, 2021.

In case no. 15cr-0353-LAB, Probation has filed a petition alleging that Mr. Cabrera has violated the conditions of supervised release. That case is set for an admission and sentencing on November 15, 2021. This memorandum analyzes the cases together, and will recommend a total sentence of 27 months in prison. Mr. Cabrera proposes that this Court sentence him to 21 months on the new case, to be followed by a consecutive sentence of six months on the supervised release case.

As of November 15, 2021, Mr. Cabrera will have been in custody for 744 days – just about two years and two weeks.

# II.
## Juan Carlos Cabrera

Juan Carlos Cabrera is a sad-eyed, somewhat mournful man who is afraid to return to El Salvador. His childhood in that country was traumatic – just a child when the brutal civil war ravaged the countryside and left millions dead, he saw his father murdered in front of his eyes by a government-backed death squad. He explains that the squads used to roam the countryside looking for people to round up and extort; anyone who resisted was accused of being a rebel and shot or worse. After his father's murder, his family moved away from their town of Metapan and hid out in mountain villages to try to escape the violence. This childhood trauma had lasting effects on him, and he spent much of his twenties drinking away the pain.

## A. Life in the United States.

He was lucky enough to come to the United States in the mid-1990s along with his mother and siblings; today, they mostly live in Florida with good jobs and visas or residence cards. Juan Carlos moved to Boston, where he briefly had the makings of a good life for himself. During his years in Boston, Mr. Cabrera worked several jobs. First, he worked at recycling plant, sorting plastic bottles. Next, he worked for a company located in Dedham, Massachusetts, called Tent For Rent. At the company, he set up and took down large tents for outdoor events. Mr. Cabrera also worked at Logan Airport in housecleaning. He helped clean airplanes between flights. He also worked as a musician – he can play guitar, bass, basso sexto, and almost any other stringed instrument.

Mr. Cabrera met Luz Benitez in 1994 in Boston through his aunt. Ms. Benitez was born in Puerto Rico and is a United States citizen. They fell in love and got married on March 1, 1997. Their daughter Chantay Cabrera was born on October 19, 1995, at Beth Israel Hospital in Boston. In 1997, Luz Cabrera filed an I-130 Petition for Alien Relative on behalf of Mr. Cabrera. The Petition was approved in May of 1997, paving the way for Mr. Cabrera to file a petition to adjust his status to that of a lawful permanent resident. Mr. Cabrera filed an I-485 petition to adjust his status in December of 1997.

Unfortunately, by that point Mr. Cabrera had begun a slow spiral into alcoholism and bad behavior. Between 1996 and 2001 he racked up several convictions based on drinking and drug use; the longest sentence he received was for six months. His marriage crumbled and he couldn't hold onto his jobs after being in and out of county jail. This troubling and sad five-year run of alcoholism and petty crime caught up with him, and he was deported from the United States for the first time in 2000.

**B.     Life in El Salvador.**

Mr. Cabrera has tried to make a life for himself in El Salvador. He has lived in his hometown of Metapan as well as in the capital city of San Salvador. But the neighborhoods there are utterly dominated by two powerful gangs originating in the United States. As he gets older, Mr. Cabrera increasingly tries to avoid interacting with them at all – he's almost 50, and an easy-going musician with no desire to get caught up in politics. But the gangs inescapably dominate life there. Recently, he had to cross a gang territory line in order to get from his tiny apartment to his factory job. Every day that he crossed, he would be harassed, stopped, searched, robbed, threatened, and humiliated – the gangs thought (or claimed to think) that he was a spy for the other side.

Mr. Cabrera also carries the trauma of his violent childhood. In his asylum application in 2018 (following his 2017 case), he described being shot at and having people come to his sister's house to look for him. El Salvador remains a terribly dangerous place for those whose past stretches back into the civil war, and many of the country's wounds have yet to heal. Mr. Cabrera feels impossibly unsafe there, and has tried many times to leave, including by moving to Mexico.

**C.     The future.**

Mr. Cabrera intends to apply again for asylum, withholding of removal, and any other relief for which he may be eligible. His prospects of success are unclear; his sincere fear for his life and safety may well be offset by his criminal record from the 1990s and by his repeated attempts to return to this country. As he enters his sixth decade, though, he'll have to find a solution to his situation that doesn't involve his returning to the United States, even to seek refuge. Each subsequent conviction for returning only brings with it the likelihood of more prison time and the dimming of his hopes of returning legally.

# III.

# Objections to the Presentence Report

**A.     Alleged facts underlying criminal convictions.**

The Presentence Report in this case details Mr. Cabrera's criminal history. *See* PSR at 7-12. He does not deny his criminal convictions. However, the Report adds to the records of the convictions several long factual allegations, taken from police reports reflecting the hearsay of alleged witnesses and police officers. Many of the factual allegations derive from double or triple hearsay.

Mr. Cabrera disputes the characterizations of each factual allegation appended to the descriptions of his convictions. He admits the convictions themselves, as well as whatever facts the government can prove that he admitted in connection with those convictions. But he denies the rest of the factual allegations, as well as all of the conduct imputed to him in the "Other Criminal Conduct" section of the PSR (¶¶ 34-39), and asks the Court not to rely on them at sentencing.

**B.     Mr. Cabrera's 2015 conviction scores as a +2, not a +3.**

Probation has incorrectly scored Mr. Cabrera's 2015 conviction as a three-point prior conviction under § 4A1.1(a), as a "prior sentence of imprisonment exceeding one year and one month." This is a mistake; the conviction only scores as a two-point conviction under § 4A1.1(b), as a "prior sentence of imprisonment of at least sixty days not counted [as a three-point conviction]."

In 2015, Mr. Cabrera pleaded guilty to a re-entry charge and was initially sentenced to twelve months in custody, to be followed by two years of supervised release. *See* PSR at ¶ 29. He was thereafter arrested on August 10, 2017, and charged with another immigration crime. *See generally* 17cr-2645-JMA. From August 10, 2017, until his sentencing date, he was in custody on the re-entry charge.

On January 25, 2018, Mr. Cabrera pleaded guilty a misdemeanor violation of 8 U.S.C. § 1325, and was sentenced to time served. PSR at ¶ 30. The Bureau of Prisons

will only count time served against one sentence at a time; *all* of the time he had been in custody following his arrest in August of 2017 therefore counted *only* toward the § 1325 sentence in 17cr-2645-JMA. *See* 18 U.S.C. § 3585(b) ("A defendant shall be given credit toward the service of any term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . that has not been credited against another term."). However, he was not released from custody; rather, he was held on the supervised release warrant, and his time in custody for that violation began counting. Four days later on January 29, 2018, his supervised release in 15cr-0353-LAB was revoked, and Mr. Cabrera was sentenced to time served, followed again by two years of supervised release. PSR at ¶ 29. The "time" he had "served" on the OSC case at that point was four days. Accordingly, the twelve months from the original sentence, plus the four days for the revocation sentence, fall below the thirteen-month requirement to qualify for a three-point sentence under § 4A1.1(a).

However, the PSR has mistakenly attributed the months between his arrest in August of 2017 and the subsequent sentencings in January of 2018 to two cases, allocating *both* 172 days of time served to the misdemeanor case in 17cr-2645 *and* 134 days of that same time served to the OSC case in 15cr-0353. This was a mistake; federal authorities only give credit for time served to a single case. 18 U.S.C. § 3585(b). The "sentence imposed" for the revocation sentence in 2018 therefore was the time served that had not been counted toward another sentence: four days.

The difference matters. Under Probation's calculation, Mr. Cabrera has ten criminal history points and is in Criminal History Category V. The correct calculations, though, leave him with nine points and in Criminal History Category IV.

## III.

## The Guidelines

**A.  Guidelines calculations: § 1325 & § 1326 charges.**

| | | |
|---|---|---|
| Base offense level: | 8 | U.S.S.G § 2L1.2(a) |
| Prior immigration offense: | +4 | § 2L1.2(b)(1)(A) |
| Pre-deport conviction: | 0 | § 2L1.2(b)(2) |
| Post-deport conviction: | 0 | § 2L1.2(b)(3) |
| Final adjusted offense level: | 12 | |
| Criminal History Score: | 9 | |
| Criminal History Category: | IV | |
| Resulting Guidelines range: | 21-27 months[1] | |

**C.  Guidelines calculations: supervised release case.**

| | |
|---|---|
| Grade of violation: | B |
| Criminal history category (2015): | II |
| Resulting Guidelines range: | 6-12 |

## IV.

## The Court Should Sentence Mr. Cabrera to a Total of 27 Months

Mr. Cabrera respectfully asks the Court to sentence him to a total of 27 months in custody, consisting of 21 months on the new case and six months consecutive on the supervised release case. He submits that this sentence is warranted in light of:

- His desire to come to this country to seek asylum or withholding of removal, which was corroborated by the trial testimony that he climbed the hill from the

---

[1] The Guidelines are identical for the two charges; Count One is limited by a statutory maximum of 24 months in custody. *See* 8 U.S.C. § 1325.

primary fence, calmly walked to the secondary fence, and sat down to await the arrival of arresting officers some minutes later;

- His strong and deep ties to this country, which include his mother, sisters, brother, ex-wife, and daughter;

- His exceptionally difficult time in custody. Mr. Cabrera was arrested in November of 2019, well before the advent of the global pandemic in March of 2020, and he had no inkling that his case could stretch on for so long or that he could face such dire straits in custody. Over the past two years, he has endured lockdowns, isolation, fear and anxiety, and deprivation of ordinary jail amenities. Worst of all, he contracted a severe case of Covid-19 in April of 2021 and was hospitalized, on a respirator, for several days. This frightening and harrowing experience has rendered his time in custody much more punitive than the ordinary pretrial detention.

## V.
## Conclusion

In light of Mr. Cabrera's history and characteristics and the statutory sentencing factors listed in 18 U.S.C. § 3553(a), he respectfully asks this Court to impose 21 months in the new case plus six months in the supervised release case, for a **total sentence of 27 months in prison.**

Respectfully submitted,

Dated: November 9, 2021

*s/ Benjamin P. Davis*
**Benjamin P. Davis**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Cabrera