```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,          )
                                        )
 5        Plaintiff,                    ) No. 20-CR-435-LAB
                                        )     15-CR-353-LAB
 6             v.                       )
                                        ) November 15, 2021
 7   JUAN CARLOS CABRERA,               )
                                        ) 6:56 p.m.
 8        Defendant.                    )
     _____) San Diego, California

 9

10     TRANSCRIPT OF SENTENCING AND REVOCATION OF SUPERVISED RELEASE
                  BEFORE THE HONORABLE LARRY ALAN BURNS
11                    UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:      UNITED STATES ATTORNEYS OFFICE
                             By:  COLIN MCDONALD, ESQ.
14                           880 Front Street
                             San Diego, California  92101
15
     For the Defendant:      FEDERAL DEFENDERS OF SAN DIEGO, INC.
16                           By:  BENJAMIN P. DAVIS, ESQ.
                             225 Broadway
17                           San Diego, California  92101

18   Court Interpreter:      DEBORAH BERRY

19   Court Reporter:         CYNTHIA R. OTT, RDR, CRR
                             District Court Clerk's Office
20                           333 West Broadway, Suite 420
                             San Diego, California, 92101
21                           cynthia_ott@casd.uscourts.gov

22

23

24

25   Reported by Stenotype, Transcribed by Computer
```

1          SAN DIEGO, CALIFORNIA, NOVEMBER 15, 2021, 6:56 P.M.

2                          *  *  *  *

3          THE CLERK:  Calling number 20 and 21, 15-CR-353,

4    United States of America versus Juan Carlos Cabrera on for

5    revocation of supervised release, and 20-CR-435 for sentencing.

6          THE COURT:  Slowly I turn to Mr. Davis and

7    Mr. McDonald.  Thank you for being patient both of you.  Sorry

8    this took so long.

9          MR. MCDONALD:  No problem, Your Honor.

10         MR. DAVIS:  No worries, Your Honor.  Someone had to be

11   last.

12         Good evening, Your Honor, Ben Davis, Federal

13   Defenders.  I'm appearing for Mr. Cabrera on both cases.

14         THE COURT:  Good afternoon, Mr. Davis.

15         MR. MCDONALD:  And good afternoon, Your Honor, Colin

16   McDonald for the United States.

17         THE COURT:  All right, good afternoon -- good evening,

18   good evening.

19              (Discussion off the record.)

20         MR. DAVIS:  Your Honor, Mr. Cabrera is present.  He's

21   in custody.  He's being assisted by the Spanish language

22   interpreter.

23         THE COURT:  All right.  Mr. Cabrera, good evening.

24   Good evening.

25         Thank you for being patient.  We've had a long

1  calendar today and unfortunately yours was the last case to be

2  called, but I appreciate that you've been waiting and you've

3  been patient.

4          Mr. Cabrera is here on two cases.  The first is his

5  convictions for two offenses, attempted unlawful entry and

6  attempted reentry by a removed alien.

7          These resulted from a jury trial.  And I can't

8  remember what date the verdict was entered.

9          MR. DAVIS:  It was in June, Your Honor.  I think it

10  was the 7th or the 8th.

11          THE COURT:  Okay.

12          MR. DAVIS:  Something like that.

13          THE COURT:  So I'll take that first.  The other case

14  is a revocation of supervised release and that's based on the

15  defendant's commission of the two offenses for which he was

16  convicted.

17          In this case I have received and reviewed a

18  presentence report.  I assume you've gone over that with the

19  defendant.

20          MR. DAVIS:  I have, Your Honor.

21          THE COURT:  Okay.  I've also looked at the following:

22  Defendant filed objections to the presentence report and the

23  government responded to those.

24          In addition on behalf of Mr. Cabrera, Mr. Davis filed

25  a sentencing memo.  And I have reviewed that memo.

1            Let's see, I think I also got -- did I get a

2    sentencing chart from you, Mr. McDonald?

3            MR. MCDONALD:  Yes, Your Honor, at ECF No. 84.

4            THE COURT:  I have it now I just came on it, so I got

5    that.

6            So those are the things that I reviewed, did I neglect

7    to mention anything that was filed by you, Mr. Davis?

8            MR. DAVIS:  No, Your Honor, that's everything.

9            THE COURT:  And you Mr. McDonald?

10           MR. MCDONALD:  That's it, Your Honor.

11           THE COURT:  I'm happy to hear from you on the

12   objections.

13           MR. DAVIS:  Thank you, Your Honor.  I think I've laid

14   it out fairly well in my papers.  I think that the government

15   and I just dispute about what the phrase "time served" means.

16           My contention is that when -- the government's correct

17   that you look at the sentence that's imposed, not the amount of

18   time spent in custody.  So if someone is sentenced to 24 months

19   and they only do 21 because of good time, obviously what counts

20   is the 24 months.

21           But here what happened is the sentencing court imposed

22   a sentence of time served and I think the way that you look to

23   the content of how much time you served on the case is how --

24   how the time has been counted by the accounting authority which

25   is the BOP.

1          And so I think the sequence of events here lays out

2     pretty clearly, federal law says you don't count a pretrial

3     detention towards two sentences.

4          So he was arrested, he pled guilty and was sentenced

5     to time served on January 25th, so all of the time that he

6     spent in custody at that point was credited towards the 17-CR

7     case and then four days later supervised release was revoked on

8     the 15-CR case.  And he was sentenced to time served.  The

9     Court didn't say, I'm sentencing you to six months or I'm

10    sentencing you to 133 days.

11         It said time served.  And at that point the time

12    that -- what counts as the time he had served at that point was

13    four days.  And so for that reason even when you add the two

14    times together it comes under the 13-month requirement for a

15    three point conviction.  And as I point out this does matter,

16    sometimes it's academic, one point here in the criminal history

17    one point there, but it does change them from category III to

18    category IV.  Or I should say it the other way, he should be in

19    category III and it lowers the guidelines by a few months.

20         So as I laid out, what my argument is, does the Court

21    have any questions for me about it?

22         THE COURT:  All of this applies to 15-CR-00353?

23         MR. DAVIS:  Well, there's two cases, Your Honor.  He

24    was -- in the 15-CR case he was sentenced to 12 months and plus

25    supervised release.  And then he came back in 2017 and he got a

1    misdemeanor that time.  And so he was sentenced to time served

2    on the misdemeanor.

3            THE COURT:  How much time had he done at that point?

4            MR. DAVIS:  It was 100 and about four months something

5    like that.

6            THE COURT:  Okay.

7            MR. DAVIS:  I have it here somewhere.  But it was a

8    133 days, somewhere around that time.  And then his supervised

9    release was revoked a few days later based on the -- on the

10   misdemeanor, on the misdemeanor allegation.  And Judge Lorenz

11   at that time sentenced him to time served.

12            And what my contention is, is that the four months

13   that he'd done in custody counted towards the new illegal entry

14   sentence and not toward the revocation sentence.

15            So if you called BOP right now and say, BOP, how much

16   time did Mr. Cabrera serve on his revocation sentence in the

17   15-CR case, BOP will say it was four days long.  That's how

18   long that sentence was.

19            So that's how much time he had served.

20            THE COURT:  All right.  Mr. McDonald.

21            MR. MCDONALD:  Your Honor, this isn't a matter of what

22   the BOP says, this is a matter of a guidelines calculation of

23   the criminal history points.

24            The question is whether for his 2015 1326 conviction,

25   whether he served more than 12 months or more than 13 months

1    and a day.  The original sentence was 12 months, then the

2    revocation sentence several years later was 134 days which was

3    the time served at the time that the judgment was entered in

4    the revocation proceeding.

5              THE COURT:  Okay.

6              MR. MCDONALD:  That's over 13 months and a day and

7    thus the --

8              THE COURT:  That's the only issue here, right?

9              MR. MCDONALD:  That's the issue that they've raised.

10   They've also raised a factual objection or really a legal

11   objection to the inclusion of hearsay in the PSR.  But the

12   issue is whether the 2015 conviction scores two points or

13   scores three points.  It scores three points because he served

14   more than 13 months.

15             THE COURT:  Right.  You take the original sentence you

16   add any time spent on a supervised release or probationary

17   revocation and add that and that becomes the total amount of

18   time that one considers in determining whether the sentence is

19   more than 13 months?

20             MR. MCDONALD:  Correct.

21             THE COURT:  That's always been my understanding,

22   Mr. Davis.

23             MR. DAVIS:  I completely agree with that, Your Honor.

24             THE COURT:  Okay.

25             MR. DAVIS:  The question is when Judge Lorenz said

1   time served on the OSC sentence, what does time served mean?

2          THE COURT:  He says it's 133 days, he's been in on the

3   misdemeanor for a while, then as I understand it there's a

4   four-day gap between his sentence on the misdemeanor and him

5   appearing before Judge Lorenz.

6          MR. DAVIS:  Right.

7          THE COURT:  The total time is 133 days, but when you

8   add that to 12 months it comes out to more than 13 months.

9          MR. DAVIS:  I understand that's what the government's

10   argument is, but what I'm saying is that when Judge Lorenz

11   sentenced him to time served, the only time that was counted in

12   that sentence was the four days between the misdemeanor

13   sentence and the revocation sentence.

14          THE COURT:  I'm not sure that's true.  When was the

15   petition filed alleging that he was in violation of the

16   original grant of supervised release that Judge Lorenz imposed

17   by coming back in?

18          MR. DAVIS:  I don't have the date in front of me, but

19   it was about a month after his arrest.

20          MR. MCDONALD:  Your Honor, I do have those dates.  The

21   revocation docket shows he was arrested on the revocation

22   petition on September 18th of 2017.  Two days later he appeared

23   for his initial appearance on the revocation petition and was

24   ordered detained.  That's ECF number 40 of 15-CR-353.

25          THE COURT:  If this were original sentencing and I

1   said time served, it would subsume all of that time.  You

2   wouldn't say that, well, that doesn't count.  He was detained

3   on that case.  He was in custody, perhaps on both.  Perhaps on

4   the new case and that one.

5         MR. DAVIS:  Right.

6         THE COURT:  But the judgment makes it clear that part

7   of the custody time is attributable to the revocation.  So --

8         MR. DAVIS:  I don't know if that's right, Your Honor.

9   He's sentenced on January 25th to time served for the

10  misdemeanor, right?

11        THE COURT:  Right.  But before January, in September

12  there's a petition filed.

13        MR. DAVIS:  Right.

14        THE COURT:  And he's arraigned on the petition.

15        MR. DAVIS:  Correct.

16        THE COURT:  Said, hey, it's alleged you're in

17  violation of supervised release.  Apparently he denies that at

18  that point, but he's detained on that case.

19        MR. DAVIS:  Right.

20        THE COURT:  Time starts accruing on that case as well.

21        MR. DAVIS:  But it can't be counted towards two cases

22  at the same --

23        THE COURT:  My, goodness, Tish.

24        THE CLERK:  It automatically shuts down at 7 I think.

25        THE COURT:  Okay.  There we go.  I'm sorry for that.

1          Okay.  I think I have in mind the argument.  Look,

2    we're talking about a period of, what, 31 days beyond the 12

3    months?  It's 12 months, regardless of good time, the

4    pronounced sentence on the original was 12 months, and so if

5    the government convinces me that he did an additional 31 months

6    attributable to that case -- I'm sorry, 31 days, then we're --

7          MR. DAVIS:  More than that.

8          MR. MCDONALD:  About 134 days.

9          THE COURT:  NO, I know it's more than that, but I'm

10   saying what we're talking about is a period of 31 days that

11   puts him over the 13 months, right?

12         MR. MCDONALD:  Correct.

13         THE COURT:  You used to ask for 13 months and a day on

14   some of those cases and I think it was because of that.  I

15   overrule the objection.  I agree with the government.  I find

16   that the judgment here is really dispositive, and the other

17   court documents that I can judicially notice, including the

18   date that he was arraigned on the petition, that allege that he

19   violated supervised release that well preceded the date that

20   Judge Lorenz pronounced sentence and then the magistrate

21   judge's detention order that emanated from that appearance on

22   the petition and the denial, none of that was resolved and he

23   remained in custody, ordered detained by the magistrate judge

24   up until Judge Lorenz sentenced him to time served.

25         It's not unusual that a person can be doing time on

1   two things, it's the reason we have concurrent and consecutive

2   sentences.  And here Judge Loren could have sentenced him to

3   consecutive time.  He could have done that.  He didn't have to

4   give him credit, because he was getting credit already on the

5   misdemeanor, and he chose not to do that.  But I don't have any

6   reason to believe that time served meant the four day interval

7   between when he was sentenced on the misdemeanor and when Judge

8   Lorenz sentenced him.

9          As I said what's operative here is the date that he

10  was detained for the allegations of violation of supervised

11  release and the fact that a magistrate judge ordered him

12  detained separately on that matter.  So the objection is

13  overruled.

14         MR. DAVIS:  Understood, your Honor.  I think I've made

15  my record on it.

16         THE COURT:  You have.

17         MR. DAVIS:  As to the other objection, the government

18  mischaracterized it as a legal objection.  It's not.  It's a

19  factual objection.  He's denied the facts that were alleged in

20  the offense conduct and so forth.

21         THE COURT:  Okay.  Well, I rely on the jury's

22  resolution of the case and I find -- it's paragraph, what, 5,

23  is that what it pertains to?

24         MR. DAVIS:  No, Your Honor.  I was referring to the

25  summaries where the -- it's in the criminal history section

```
 1    where the probation officer repeats what the police report
 2    said.
 3              THE COURT:  Oh, okay.  All right.
 4              MR. DAVIS:  It includes a number of facts that when I
 5    was reviewing it with Mr. Cabrera, he said, no, I didn't say
 6    that, I didn't do that.
 7              THE COURT:  Okay.
 8              MR. DAVIS:  And it's my practice often to just say,
 9    look, these are from 20 years ago and he denies the facts that
10    he didn't admit at the time.
11              THE COURT:  Okay.  I'll accept the objection and not
12    rely on any of the narrative portions.  You don't deny that he
13    suffered the convictions that are set forth, okay.  I'm happy
14    to hear from you generally on behalf of the defendant.
15              MR. DAVIS:  Thank you, Your Honor.  I'm sure the Court
16    remembers this trial.  This was the trial where Mr. Cabrera was
17    arrested between the fences sitting with his back, walked up
18    the hill sat down and waited for the border patrol agent to
19    come up to him.
20              THE COURT:  Right.
21              MR. DAVIS:  I can tell you when we were preparing for
22    sentencing Mr. Cabrera reiterated to me that his intention is
23    to apply for relief from -- to avoid being removed to El
24    Salvador.
25              Things are extremely difficult and violent in that
```

```
 1    city and he just feels unable to live there.  I've told him

 2    that, frankly, I don't think that he has a particularly good

 3    case.  He's not eligible for asylum, and it's likely the

 4    standards for the other forms of relief that he would face,

 5    such as withholding under the convention against torture,

 6    they're very, very high standards.

 7            THE COURT:  Right.

 8            MR. DAVIS:  And I just don't think it's likely that

 9    he's going to make them.  But he's told me that he just -- he

10    fears returning there and he's going to exhaust whatever

11    ability he has --

12            THE COURT:  Mr. Davis, isn't it the case -- I don't

13    know this to be true but I've read this that Mexico, for

14    example, has offered amnesty or at least, you know, safe harbor

15    to anybody traveling from the Central American countries which

16    used to be an impediment to getting amnesty here in the United,

17    States, right?  If some other country between the country that

18    is oppressing you and the United States will offer you safe

19    harbor you can stay there and my understanding is Mexico has

20    made that blanket offer to all of these people that are

21    currently coming across and presumably it would extend to

22    Mr. Cabrera.

23            MR. DAVIS:  I don't know that factually, Your Honor.

24    That may well be the case.

25            THE COURT:  I don't either.  But I've read that's the
```

1    case.

2          There's a heated debate going on about immigration now

3    and the proponents of keeping the border tightly sealed say,

4    hey, wait a minute, they don't need to come here, Mexicans

5    speak their language, Spanish, people coming from Central

6    America for the most part and the Mexican president has said,

7    oh, you're olly olly oxen free here.

8          MR. DAVIS:  Well, I hope that's the case, Your Honor,

9    that he can find somewhere between his home country where he's

10   not able to stay and the United States where he's also not able

11   to stay.

12         THE COURT:  That's really a matter for immigration

13   courts, right?

14         MR. DAVIS:  I agree.  I'm just talking generally about

15   what he's going to do with himself because, you know, I know

16   the Court may view this differently but I view this as a really

17   sad situation for him.

18         You know, I'll tell you, Your Honor, we sometimes have

19   this experience when I review someone's A-file where you go

20   backwards through time, you know how they're stacked so the

21   most recent documents are at the top and the old documents are

22   at the bottom.  And when you go through the A-file, you

23   sometimes see the photographs that are appended as they go

24   backwards in time.  And you see the defendant, my client,

25   someone I'm getting to know well over the two years that I

1  represented him getting younger and younger.  And then you go

2  back to often the first photograph.

3           And he had some photographs attached -- I didn't

4  include them in my sentencing memorandum, but they're from his

5  wife's petition to legalize him back in the late '90s or mid

6  '90s.  And they're pictures from his wedding day, and they were

7  in the basement of a church in Boston.  And Mr. Cabrera looked

8  young and hopeful and like he had, you know, a lot going for

9  him that perhaps he was going to get married to his wife who's

10  a United States citizen, that maybe he could work hard, that

11  maybe he could have a future here.

12           And what happened obviously is that he had a strong --

13  a really problematic relationship with alcohol and drugs, that

14  his wife and daughter have attested to in the presentence

15  report.

16           He had this five-year run of really troubling crimes

17  where he's being drunk and getting arrested for cocaine

18  possession and marijuana possession and assaults and things

19  like that, and he just couldn't get a handle on it and because

20  of that, he lost every chance that he's had to live in this

21  country.  And the criminal record since the early 2000s is

22  really just the reentries of him trying to find a way back.

23           THE COURT:  I think the evidence at trial was that

24  he'd never had legal status in this country, right?

25           MR. DAVIS:  He never received legal status.  His wife,

1    he had an approved I-130 petition, this is part of the 1326(d)

2    motion, why I thought that he had a very plausible chance of

3    going through departure.

4            THE COURT:  Right.

5            MR. DAVIS:  Because his petition had been approved, so

6    the next step would be to file the application for legal

7    permanent residence but he was deported in the meantime.

8            You know, and he also had the criminal record, so

9    maybe he wouldn't have been granted it.  I don't know.  But he

10   definitely, there was a moment there where he had his shot at

11   getting it and he fumbled it away.  And I find that a very sad

12   fact and I know that he does too.

13           And it's really sad to look at someone who looking at

14   these pictures from when he's getting married is sort of on the

15   cusp of one kind of life and then the paths fork really

16   divergently.  And since he was removed, I think it was 2002 or

17   2003 he's tried many times to return to his family and to

18   escape El Salvador.  And I've certainly given him the advice

19   that I don't think he's ever going to be able to legalize his

20   status in this country and, you know, I encouraged him to seek

21   whatever form of withholding or asylum that he's able to.

22           I know that he intends to ask for a reasonable fear

23   interview and try to convince the immigration authorities that

24   he fears returning to El Salvador.

25           I think it's going to be a hard row for him to hoe

1   though just given the criminal record and the fact that he's

2   had it denied before, because the sad truth is that sometimes

3   people can be in untenable situations that they cannot stand

4   and cannot tolerate and that are unbelievably dangerous but

5   that that doesn't form a legal basis to come to this country

6   and seek refuge.  And that's the truth.

7           And Mr. Cabrera is going to have to learn that.  I can

8   tell Your Honor, I've worked with him a lot.  He's one of the

9   re-entry client I think I know the best.  He's been my client

10  for two years now in this case.  I also represented him in the

11  17-CR case.

12          He's a very pleasant and respectful person.  I really

13  have a hard time connecting him with the drunk and violent

14  person that's represented in the criminal record from the '90s

15  and the early 2000s.

16          He speaks about faith a lot.  He speaks about music.

17  He speaks about his family members.  He's talked -- told me a

18  lot about the journey.  I know the Court's aware of the journey

19  that folks take from El Salvador and the trains and the danger.

20          THE COURT:  Right.  It's arduous.  A lot of walking

21  too.

22          MR. DAVIS:  Yeah, and there's extortion and fear.  And

23  I think the Court can appreciate the desperate extremes that

24  one finds yourself in to willingly take that trip over and over

25  again.

1          And I think he has this -- this dream that -- of, you

2    know, that if things are so bad for him in El Salvador that

3    that maybe means that that's a basis for seeking refuge here.

4    And I think the fact is that we have good and strong and

5    appropriate asylum and refugee laws but they just

6    don't -- they're not going to operate to his benefit.

7          That's my opinion, I'm not an immigration attorney.

8    But I've tried to convey that message to him that I think that

9    it seems to me that the outcome of these long and painful and

10   dangerous journeys is really just going to be time in custody.

11          And I sort of want to use that to pivot to talk a

12   little bit about his time in custody in this case.  I know the

13   Court has been skeptical of variances because of COVID in lots

14   of cases and I certainly understand why and certainly,

15   especially when there are defendants who were arrested after

16   COVID began when sort of the idea was you knew well that jail

17   is a dangerous place.

18          THE COURT:  Sure.  Yeah, no, it doesn't make a lot of

19   sense when a person picks time, place and manner that's right

20   in the middle of a pandemic to say I'm going to give you time

21   off because you chose to do this then.

22          MR. DAVIS:  Right.

23          THE COURT:  I get it, this is November 4th, 2019,

24   right, before the pandemic was upon us or we appreciated that

25   it was upon us.

1          MR. DAVIS:  Right.  And I think that he caught the

2    brunt of all the disruptions that it had.  We continued the

3    trial I think about a year.  It was initially supposed to be

4    set in the summer of 2020 and it was tried in summer of --

5          THE COURT:  Did he get COVID?

6          MR. DAVIS:  He did.  We had a trial date in April or

7    May of this year that we continued because he was hospitalized

8    on a respirator with COVID.  He was in the hospital for about a

9    week we had to continue it a couple of times.

10         So he's really, of all the sufferings the Court's

11   heard about for the COVID, how it's affecting the jails, he's

12   received all of them.  I mean, he's dealt with the isolations,

13   the lockdowns, the inability to have commissary, or exercise,

14   phones, things like that.  But then also getting COVID himself,

15   being hospitalized with a respirator is to me strikes a very

16   serious case, not simply some of the easier symptoms that we've

17   heard about but much more serious symptoms.

18         And then just the anxiety of two years in pretrial

19   detention where there's no programming and there's no outdoors.

20         He's been inside at the MCC, Your Honor, for two years

21   now.  If we tried the case in 2020 and he'd been convicted and

22   sentenced to time, you know, he could have spent the last year

23   at least with a yard to walk around.

24         So I think that to the extent that the Court has ever

25   viewed COVID as, you know, time spent in COVID custody as

1    qualitatively different from time spent in ordinary custody,

2    I'd urge the Court to take that into consideration in this

3    case.  Because I think that Mr. Cabrera has well and truly been

4    punished during the two years that he's been in custody on this

5    case.

6            So I think the Court has my recommendations well in

7    hand.  I'm asking for -- obviously I've asked for a total

8    sentence between the two cases of 27 months.  I split that with

9    21 on the first case, which was the low end of the guidelines

10   as I calculated them.  I'm going to stand by that

11   recommendation.

12           I think it takes into consideration

13   Mr. Cabrera's -- how his criminal history has aged out over

14   time and that, you know, the Court, I don't know what the

15   Court's personal view was on the trial testimony -- or trial

16   evidence, but I certainly think that the case that was put

17   forward was consistent with Mr. Cabrera's trying to seek asylum

18   again, with him sitting down and waiting for the agents to

19   arrest him.

20           Obviously the jury didn't find it that way and the

21   Court may not have as well, but this is not someone who is

22   jumping -- or running through the wilderness and hiding from

23   the officers and making them climb up the mountains and things

24   like that.  He sat down between the fences and he waited for

25   them to come.

1          THE COURT:  There's no evidence that Mr. Cabrera was

2    aware of this, but my own recollection is that the stay in

3    Mexico policy that was in place at the time, that was later

4    rescinded when we had a change of administrations, I understand

5    it's been reinstated now because a federal judge found that the

6    executive order terminating the stay in Mexico policy didn't

7    comply with the Administrative Procedures Act.

8          The United States challenged that ruling, but no

9    court, including the Supreme Court, stayed the ruling so it

10   went into effect.  And the last I read, the Biden

11   administration was attempting to negotiate with Mexico and get

12   it reinstated.

13         But the point is, forget about what happened after

14   2020, in November of 2019, that program was in place.

15         MR. DAVIS:  Correct.

16         THE COURT:  He had to stay in Mexico in order to file

17   his asylum claim, right?

18         MR. DAVIS:  Correct.

19         THE COURT:  That would have been the case?  As I said

20   I don't know that he's aware of it but it kind of underscores

21   the fact that he should not have come back.

22         This amounts to now, what, his -- certainly his fourth

23   immigration conviction overall?

24         MR. DAVIS:  Correct.

25         THE COURT:  Three of which have been felonies.

1          MR. DAVIS:  Yes.

2          THE COURT:  And one misdemeanor.

3          MR. DAVIS:  Yes.

4          THE COURT:  And two of the felonies and one of the

5   misdemeanors have occurred in the last six years?

6          MR. DAVIS:  Yes.

7          THE COURT:  And at one point, Mr. Davis, he got 56

8   months, right?  That was back in '07.

9          MR. DAVIS:  Yes.

10          THE COURT:  Then he was in front of me the next time

11   on a felony, was that right?

12          MR. DAVIS:  No, Your Honor, it was originally Judge

13   Lorenz's case.

14          THE COURT:  Oh, I thought I imposed a 12-month case.

15          MR. DAVIS:  It has your initials on it now, Your

16   Honor, but it was in front of Judge Lorenz.

17          THE COURT:  So he imposed 12 months?

18          MR. DAVIS:  He imposed 12 months.

19          THE COURT:  Okay.  And that was, let's see the first

20   one was '07 and that was 2015?

21          MR. DAVIS:  Yes.

22          THE COURT:  So that's the case that's in front of me

23   on the supervised release violation?

24          MR. DAVIS:  Correct.

25          THE COURT:  His sentence was the result of a departure

1    or a variance.  I note on the judgment, original judgment, and

2    Judge Lorenz embellished on it under part D justifying the

3    sentence underneath the -- below the guidelines, but it's

4    checked here that it was a defense motion for a sentence

5    outside the guidelines, and he certainly faced more than 12

6    months at the time, right, on guidelines?

7            MR. DAVIS:  It sounds like it, Your Honor.

8            THE COURT:  Yeah.

9            MR. DAVIS:  I don't have the calculations in front of

10   me.

11           THE COURT:  So here's the concern I have.  I think he

12   faces up to 24 months as a sanction on the 15 case because the

13   first sentence was the result of a variance or departure.

14           I know the guidelines applicable are less than that.

15   But, you know, I have a very different concern here.  I'm

16   concerned about the background.  I take your point that the

17   violent offenses and, you know, let's be specific about what he

18   did, they're very violent defenses -- or offenses that make me

19   believe that at least at one point, you know, he was a very

20   violent guy.

21           And I'm talking in particular about the assault with a

22   knife that's recorded at paragraph 25, breaking and entering in

23   the daytime.  Let's see, oh, he pled guilty to all counts, that

24   included an assault with battery with a dangerous weapon?

25           MR. DAVIS:  Yes, Your Honor.

THE COURT:  And a threat to commit crimes which was a misdemeanor.

Now, you know, it's true as you say those were 20 years ago, but they formed the basis for why it would have been really unreasonable, irrational for him to think that he could come back to the United States, notwithstanding the circumstances in El Salvador.  I can't imagine with a record of serious violence like that -- put aside the other stuff, destruction of property and drug possession and all that.

Obviously the Court that sentenced him in Massachusetts recognized the danger that he posed because that Court imposed a 56-month sentence.

By '07, the guidelines were advisory.  So the Court wasn't compelled to impose that sentence.  That was an exercise of discretion.

MR. DAVIS:  Yes, but I think he probably would have had at least one plus 16 under the old guidelines.

THE COURT:  Yeah, yeah, he probably would have.  Now why Judge Lorenz downgraded it to 12 months in custody after 56 months, I don't know I haven't spoken to him.

It may have been the passage of time.  When, lets's see, he was released -- he was released in 2011, so it was just four years earlier that he'd been released and he's back already.

I don't know why he imposed the sentence that he did,

1   but I have a different view on this, Mr. Davis, and it's that

2   56 months didn't deter this fellow.  He's back.  He gets 12

3   months, which I think was probably the wrong message, that's my

4   view.

5          I don't -- again, I don't mean any criticism of Judge

6   Lorenz.  Each judge sentences according to different

7   priorities, but I would look at this and say, boy, this guy is

8   really violent.  And 56 months didn't keep him out, he's back

9   and gets 12 months.

10         And I don't think this is on any judicial officer, but

11  he comes back again in '17 and the government decides, well,

12  two felonies and a sentence of 56 months, 12 months didn't

13  work, let's try a misdemeanor.  And they let him plead to a

14  misdemeanor.

15         MR. DAVIS:  That's because we filed a 1326(d) motion,

16  Your Honor, and I think they felt they had vulnerability --

17         THE COURT:  Did you represent him on that one?

18         MR. DAVIS:  I did.

19         THE COURT:  Whatever the reasons, but what occurs to

20  me is that he has not been deterred by long sentences.

21         He keeps coming back.  And to tell you the truth, I

22  have on my notes that a variance for deterrence is in order,

23  that the guidelines prepared here.  And I hope you believe me

24  and trust me on this, this has nothing to do with his election

25  to go to trial.

1          I never ever, I never ever punish people for going to

2     trial.  That's his right.  They charge him, he's got a right to

3     say you prove it.  I don't care whether he's guilty or not

4     guilty and I don't punish people for that.

5          But if this was a matter of original sentencing and he

6     pled guilty I would feel the same way.  These sentences have

7     not been sufficient to deter him and now I'm being asked to

8     impose a sentence of 33 months by the government.  I don't

9     think -- frankly, I'm inclined to vary upward and here's my

10    thinking on this:  I think the reason the government brings

11    these charges is to try to dissuade people from doing this

12    again.

13         That's the only point.  Because they do time here.

14    Used to be they get deported.  Maybe he won't be deported now.

15    I shared an experience -- I don't think you were here in court

16    at the time, 10 times a month now I'm getting petitions from

17    probation to change supervised release conditions because we

18    all assumed that, you know, somebody convicted of 1326 with a

19    serious criminal record would be deported when they finished

20    the sentence for that.

21         I'm getting these petitions that say, oh, we're being

22    told by Department of Homeland Security or ICE or whoever does

23    the deportations that these don't qualify under the guidelines

24    anymore.

25         And I'm thinking how peculiar this must be to these

1   people.  They've just done a long sentence for this.  They've

2   done it many, many times, they've been told by the judge, don't

3   come back and then they're told, oh, you can stay here.

4          Another judge called me a week ago or so and said,

5   look, I've had a similar experience.  I had a defense attorney

6   call me.  This guy did his time and the defense attorney called

7   me and said what do I do, Judge, my client called me, he's at a

8   bus stop.  He's been released on to the street.  There's

9   nowhere to go.

10          It's crazy and it's zany, but my sense of things is

11  they bring these charges primarily with the objective of

12  deterring people from coming back.

13          MR. DAVIS:  I agree.

14          THE COURT:  But my point here, Mr. Davis, is it hasn't

15  worked with this fellow.

16          I mean, you know, I get it.  I get the time lapse and

17  the different sentences and all but, you know, it just doesn't

18  seem to me that 33 months is going to do the trick.

19          56 months didn't do it and two subsequent prosecutions

20  and impositions of sentences and revocations didn't do it.

21          MR. DAVIS:  Yeah, I guess, Your Honor.  I think that

22  maybe we have an empirical difference about whether the length

23  of sentence deters people in cases like this.

24          THE COURT:  Yeah, I've seen the arguments, I don't

25  know if you've offered them, but your office argues that, says,

1    oh, there's not a relationship between the two things, well.

2          MR. DAVIS:  I don't think there's not a relationship,

3    I just think there's a subtle one and it's multifaceted.  For

4    example in a border bust, Your Honor, I think length of

5    sentences does do some work to deterring people.

6          I think the Court and I would disagree about the

7    length of sentence necessary to deter people, but I think you

8    go back on the street and you say, hey, look don't go down

9    there and drive a car for somebody because you're going to go

10   to prison for two, four, six, whatever many years, and I think

11   that does some work.

12         THE COURT:  Right.

13         MR. DAVIS:  But -- and there are I think reentry

14   clients for which it also does some work.  But I think there

15   is -- these circumstances, Your Honor, I don't know if they're

16   fixable by courts, right.

17         I don't think that, whatever it is, think about what

18   Mr. Cabrera has undergone to be here in this courtroom, you

19   know, and the suffering that he's undergone.  And I don't know,

20   and I'm careful about this kind of argument because I don't

21   want to suggest to the Court that, you know, you need to go up

22   higher, you need to go higher than 56 months or something like

23   that.

24         THE COURT:  No.  Yeah, I know that's not your

25   position.

1          MR. DAVIS:  I'm just saying I think there comes a

2    point, Your Honor, where there is a desperation that I don't

3    know if the length of sentence, to like Mr. Cabrera the seven

4    additional months is going to tell him when he gets back to San

5    Salvador and he's crossing the gang line to get to his factory

6    job and they're holding guns to his head and taking the five

7    dollars that he's earned that week out of his pocket --

8          THE COURT:  But he doesn't have to go back there.  I

9    presume he'd be unmolested in Mexico.  No one molested him on

10   his way up here in Mexico, right?

11         MR. DAVIS:  I don't know that, Your Honor.  I would

12   find it hard to believe that he didn't have --

13         THE COURT:  You say you've got a relationship with

14   him, I'm sure he would have told you, no, I couldn't stay in

15   Mexico if that were the case and tell you why.

16         MR. DAVIS:  I thought you meant on the voyage.  Well,

17   I can tell you --

18         THE COURT:  I'm not -- Mr. Davis, I'm not talking

19   about, I'm not talking about the -- you know, the reason he

20   came across or what happened there.

21         But what I put to you earlier about the President

22   offering amnesty, asylum to all the people that have come

23   across.  I'm just saying on this particular trip before he got

24   to where the fence was and across the fence, had anybody said

25   you can't stay here, you can't settle here?

1          MR. DAVIS:  I don't know if the authorities had done

2    that, but certainly the armed gangs that terrorize the Tijuana

3    refugee camps had done that.

4          THE COURT:  Well, go some place else.

5          It's not like there's no safe place in Mexico.  And I

6    get it, it's more dangerous than here.  But he can't come here.

7    He's got a disqualifying record.  That's the frustration I

8    have.

9          And, honestly, I agree with you, but I think the

10   obverse is also true that these sentences of 12 months and then

11   a misdemeanor prosecution, whatever the reasons were, send the

12   wrong message to him.

13         It's dialing it down.  You know, if the purpose is to

14   try to deter him by imposing a sentence, it doesn't help when

15   the sentence for doing the same thing twice before successively

16   becomes less 12 months and then whatever he got.

17         MR. DAVIS:  I don't know about the 12-month sentence

18   because I didn't represent him and I don't know what the facts

19   were there.  I can tell the Court that the misdemeanor was, you

20   know, we filed a 1326(d) motion and the government felt it was

21   a strong one and elected not to pursue it.  And at that point

22   he didn't have a misdemeanor, so.

23         THE COURT:  Did he get deported again after that

24   misdemeanor conviction?

25         MR. DAVIS:  Yes.

1           THE COURT:  Was that the deportation they relied on at

2    the trial?

3           MR. DAVIS:  I don't know, I don't remember.

4           THE COURT:  It was?

5           MR. MCDONALD:  We did rely on that one, April 4th of

6    2018.

7           THE COURT:  Was there a (d) motion filed in this case?

8           MR. MCDONALD:  Yes, the Court denied it.

9           THE COURT:  Did the deportation after the misdemeanor,

10   was it one of those that just incorporated prior deportations?

11   the reinstatement?

12          MR. MCDONALD:  Yes, it was.

13          THE COURT:  But apparently you saw the merits

14   differently on the (d) motion?

15          MR. MCDONALD:  I did, Your Honor.

16          THE COURT:  Okay.  All right.  All right.  Mr. Davis,

17   anything else?

18          MR. DAVIS:  No, Your Honor, I just --

19          THE COURT:  I guess I should give you a chance, you

20   know, on a departure I have to give notice of it, I don't know

21   why you don't have to do it on a variance but you don't.  But

22   I'm telling you I'm considering a departure here because I

23   frankly think 33 months is insufficient to achieve the

24   objectives of sentencing under 3553, particularly two strong

25   ones, protecting the public and deterrence.

1    And you say, you know, what are we to do.  Look, if it

2    takes incapacitating him just to prevent him from doing this

3    again then I think that's a valid objective too.  I'm not

4    talking about giving him a life sentence or anything like that,

5    but if he's bent on coming back -- and it seems to be he is,

6    and there's nothing I can do, well, you know, if he's going to

7    come back, he's going to be in jail.

8        MR. DAVIS:  Yeah, I don't think that there's nothing

9    you can do, Your Honor and I think the gist of the scholarship

10   that my office often cites to the Court is that it's the

11   certainty of being caught and prosecuted and that he's not

12   going to get through that will drive the message.

13       THE COURT:  Maybe he got the wrong message when they

14   capitulated on the 1326(d) motion back in '17.  Maybe, he

15   thought, well, I can invoke a legal technicality and at least

16   come in.  But he was still caught and prosecuted.  It was still

17   a misdemeanor.

18       MR. DAVIS:  That's true.  But I'll tell you this, Your

19   Honor, since the first reentry case in '07, he's never

20   successfully made it into the country.  And I think, you know,

21   what I hope and what I am telling him today and what I've told

22   him in preparation for the sentencing is that I don't think

23   he's ever going to make it into the country because the odds

24   are against it and they're not going to catch and release him

25   because of his record.

```
 1            They're always going to prosecute him.  And so what I
 2   hope that that gives the message to him is that before he sets
 3   out on the journey north he says, this is hopeless.  I'm not
 4   going to be able to reach my family, and I'm not going to get
 5   asylum, and that I think is more of a deterrence than maybe
 6   I'll get through and if I don't it's another couple years or
 7   three years, or 33 months or whatever the Court is thinking
 8   about imposing in a federal jail which is better than the
 9   streets of Metapan, El Salvador.
10            And so I think sending the message that coming here is
11   hopeless is stronger medicine than sending the message of maybe
12   he'll get through, maybe he won't, and if we happen to catch
13   you, you know, it's like playing the lottery, right, or doing
14   Russian roulette as opposed to saying you're just not going to
15   come through, you're not going to make it and I think that's
16   what --
17            Look, I understand, Your Honor, it's the fourth one,
18   so a lot of these claims that I have the Court can say, well,
19   wasn't that true the last time.  Wasn't that true the time
20   before that, and I understand that.
21            I can just tell the Court that as he gets older I
22   think he is going to learn that he is not simply not going to
23   be able to come into this country again and that he's going to
24   have to find a place for himself somewhere else.  And that's
25   very, very difficult for people to accept sometimes and it's
```

1   something that he has to accept.

2          I also just reiterate, Your Honor, I know time to sum

3   up because we're getting into it, but I do think that the Court

4   should -- I do urge the Court to take into consideration the

5   time that he spent in custody and --

6          THE COURT:  Okay.

7          MR. DAVIS:  And how it's qualitatively different from

8   other times.

9          THE COURT:  Right.  You make a good point on that.

10  The objection I have to it is that typically the offenses

11  committed during COVID when everybody is aware including the

12  offender that that's not the case here.  He committed his

13  offense preCOVID.  I'm more inclined to credit that even though

14  the government is not asking for it here, but it'll moderate my

15  desire to impose a sentence that's longer than what he served

16  before.

17         Mr. Cabrera, I'm happy to hear from you, whatever you

18  want to say.  This is on the case that the jury convicted you.

19  You'll have a right to speak again because you face a

20  revocation on an older case where you were convicted of the

21  same thing, told not to come back and by coming back illegal ly

22  you violated those conditions.

23         But we'll get to that in a minute.  For now, I'm happy

24  to hear whatever you have to say regarding the case that you

25  stood trial for before a jury and were convicted of both counts

1    by the jury.

2            THE DEFENDANT:  Well, first of all, good afternoon to

3    everyone.  I would like to offer an apology for having entered

4    the United States illegally once again, knowing that I

5    shouldn't have done it.

6            But my childhood was so hard.  And I did not have the

7    opportunity to go to school and I think that I have mental

8    problems because as my attorney said and I thank the attorney

9    because of the way he explains things so well.

10           And so when I came here I enrolled in Bankers Hill

11   Community College to learn English as a second language because

12   I wanted to be a productive person and I did not want to become

13   a burden for the government.

14           And so my teacher, Angie, one day called me over and

15   she said to me, Mr. Cabrera, you are not prepared to learn

16   English because you don't know Spanish grammar.

17           So she said to me you have to go back to the Hispanic

18   center so that you can learn calligraphy and then you can learn

19   English and you can be the guitar player that you've always

20   wanted to be because I've always liked music and I wanted to be

21   a guitar player.

22           So all of my classmates at Bankers Hill Community

23   College were able to graduate, and I was very sad because I

24   wasn't able to go to school and be a different person and I

25   didn't have a mother or a father.

1          THE COURT:  So, Mr. Cabrera, if you could sum up here,

2    I am familiar with your history.  I have read the presentence

3    report.  I've even looked back over the old presentence report.

4          THE DEFENDANT:  So I was very sad and I started to

5    drink alcohol and I wasn't able to stop and sometimes I guess

6    people would offer me cocaine, but I'm not a drug addict, so I

7    don't do hard drugs like crack or anything.

8          And I do have a problem with alcohol and perhaps once

9    I was drunk, well, I made mistakes under the influence of

10   alcohol because it destroyed my mind.

11         So I would like to offer an apology for what I've

12   done, and I'm not going to come back to the United States

13   anymore because I have suffered very much.

14         And I am an older person now and I am going to make my

15   life anew.  And so that's why I beg Your Honor to consider my

16   age, and I will no longer insist in coming to the United

17   States.  I will forever stay out of the United States.

18         Please excuse me, and I would like to ask the United

19   States to excuse me for everything that I have caused here

20   thinking that I could come back.

21         THE COURT:  Okay.  Thank you, Mr. Cabrera, I

22   appreciate your statement.  Mr. McDonald.

23         MR. MCDONALD:  Your Honor, just a few brief points,

24   number one, when the defendant was before the district of

25   Massachusetts in 2007 being sentenced, he said virtually the

1    same thing that he was sorry and said he would come back no

2    more.  That's quoted in our response to the (d) motion at ECF

3    number 23 on page seven.

4         With respect to El Salvador that, Your Honor, is a

5    false dichotomy that the defense props up that he only has two

6    choices, which is to either be in El Salvador or to be in the

7    United States.  And the reason we best know, you know, that is

8    the very words of the defendant.

9         In paragraph 56 of the PSR, for instance, he says that

10   he plans to reside in Puebla Mexico and seek available

11   employment.  That's his future plans, not to be in El Salvador

12   but to be in Mexico.

13        Can also look at PSR paragraph 51 where he said that

14   he lived in Metapan until the age of 16 when he moved to Belize

15   for three years.  He then moved to Villahermosa, Mexico for

16   three year.  He then, for instance, lived he says in Mexicali

17   from 2007 onward, and we know that for a -- a large part of

18   that time he was in federal custody.

19        But the point is that it appears as though he has been

20   in Mexico for a large part of his life and indeed has said that

21   he plans to return there.

22        The guideline range, the properly calculated guideline

23   range is 27 to 33 months, and Your Honor has noted the facts

24   that the United States also was focusing on in recommending

25   that high end sentence, which is the fact that this is the

1    defendant's fourth immigration conviction and this is a

2    graduated increase from what he previously has received.

3           I do note, I do think the COVID issue is one that Your

4    Honor should take into account, and I know that Mr. Cabrera has

5    had somewhat of a roundabout with COVID and being at the MCC.

6    And I do think that that's appropriate for Your Honor to take

7    into account.

8           We are, and in light of that, in light of the equities

9    presented, we're recommending 33 months and 24 months on the

10   1325 felony count.

11          THE COURT:  All right.  Thank you, Mr. McDonald.

12          The Court finds as follows:  First, as to the

13   guidelines, I find the base offense level is eight.  The

14   defendant has a prior illegal reentry offense, that adds four.

15   The adjusted offense level upward is 12.

16          No one's contending that he's accepted responsibility

17   and I find that he has not.  There was no demonstration of

18   acceptance at any point and that's notwithstanding that he went

19   to trial, but the guidelines do advise that it's a rare case

20   where a defendant can claim that he's innocent of the charge,

21   be convicted by a jury and still be entitled to acceptance and

22   I don't find this is one of the rare cases.  So it remains at

23   12.

24          The defendant is in criminal history category V.  The

25   Court has made a finding regarding that, and as mentioned by

1    Mr. McDonald the guidelines applicable to him are 27 to 33

2    months.

3            I'll keep that range in mind as I turn to the 3553

4    factors.  First, let me note that on count two, count two, the

5    defendant's exposure is up to 20 years imprisonment.  As to

6    count one, his exposure is just two years imprisonment.  So I

7    have the statutory maximums in mind as well.

8            MR. DAVIS:  Excuse me, Your Honor, I think the

9    statutory maximum is 10 years.  He does not have an aggravated

10   felony.

11           THE COURT:  The probation officer said it's 20.  And I

12   think -- are you contesting that, for example, the assault with

13   a dangerous weapon is a felony is not an aggravated felony.

14           MR. DAVIS:  Yes, for a crime of violence, Your Honor,

15   it requires more than a year in custody, more than a yearlong

16   sentence under 1101843(f).

17           THE COURT:  Okay.  So you're saying by virtue of the

18   sentence imposed, it won't qualify?

19           MR. DAVIS:  As an aggravated felony.

20           THE COURT:  What about the assault and battery with a

21   dangerous weapon, are we in the same situation, did he get less

22   than a year?

23           MR. DAVIS:  Yes.

24           THE COURT:  Okay.  All right.  I assume, Mr. McDonald,

25   you agree with that by virtue of the sentences and

1  notwithstanding the title or elements of the charges, these are

2  not violent felonies or crimes of violence that would subject

3  the defendant to a 20-year exposure?

4          MR. MCDONALD:  Your Honor, I haven't thought through

5  this issue with this specific issue in mind, but I think it

6  would be prudent for Your Honor to just consider it as a ten

7  year cap.

8          THE COURT:  I will.  I'm not going to impose anywhere

9  near 10 years, so I'll accept that argument and impose -- and

10  assume that on the 1326, count 2, his exposure is up to 10

11  years.

12          3553 factors, look, the manner in which the offense

13  was committed here is not aggravated.  There was not any

14  resistance or anything like that.  But the real problem is when

15  I get to the history and characteristics.

16          And it dovetails with another 3553 factor that I've

17  discussed with Mr. Davis which has to do with deterrence.  This

18  fellow just has not been deterred.  And I -- you know, it's

19  kind of a perverse thing that he goes from 56 months for this

20  offense, commits the very same offense and gets 12 months.

21  Again, I'm not casting shade on any other judge or the

22  sentence, and I don't know what the circumstances are.  But,

23  you know, the concentration here is on how much time a person

24  has done and it controls the issue, for example, of whether a

25  felony is a violent felony or considered by one.

1    But I wonder what the message is when a guy gets 56

2  months, commits the same crime, gets convicted of it and then

3  gets 12 months.  I'd be very confused if I was the offender.

4  And then, on top of it, he comes back and suddenly the offense

5  is down to 172 days, because we've downgraded the charge to a

6  misdemeanor.  Now, again, I understand the background.  Some

7  Assistant U.S. attorney didn't think that he could prevail on

8  the (d) motion or was too lazy to write up a response.  I don't

9  know which it was, but for whatever reason.

10    And so if I'm in Mr. Cabrera's position, I'm really

11  confused.  I'm being told by judges don't come back, but then

12  when I do come back the punishment kind of oddly is way less

13  than what I got for the former offenses, 56 months as I said

14  morphs down to 12 months, of, what, 44 month reduction.

15    And then 12 months morphs down to 172 days which is

16  less than -- which is less than half of what I got before.  My

17  goodness, notwithstanding what a judge said, if I was in his

18  position I'd say, you know, I know they're saying this but that

19  hasn't been my experience.

20    Now, look, I want to emphasize something.  I'm

21  inclined to vary in this case, but less than I was inclined to,

22  to begin with.  And I want to say as a preface to the variance

23  that I intend to impose, this has nothing to do with the

24  defendant going to trial.  And I think -- I can't speak for

25  Mr. Davis, he acknowledged I think by nodding his head, maybe

42

1  even agreed with me, that my reputation as a judge is one that

2  people get to try their cases and I don't punish people for

3  going to trial.

4          I'm not doing that here.  He had a right to say prove

5  this.  Prove it.  Prove every aspect of it.  Prove my

6  deportation was legal.  Prove in front of the jury that I

7  wasn't just trying to give myself up, that I, you know, and all

8  of that was at the fore, the jury decided against him.

9          That's fine.  I have no heartburn at all.  This was a

10  short trial anyway.  What was it a day, day and a half

11  something like that?

12          MR. DAVIS:  Day and a half.

13          THE COURT:  There's nothing for anybody, particularly

14  somebody that wants to be a trial judge to be mad about, the

15  guy asserts his right to go to trial.  So, Mr. Davis, I hope I

16  have you convinced of that, but I say these things for the

17  record, because if you go up from a guideline sentence after a

18  guy's gone to trial, I would immediately suspect, oh, this guy

19  is being punished.  It's a so-called trial penalty.  That is

20  not my intention at all.

21          As I mentioned to you, if I were looking at this as a

22  matter of first impression with Mr. Cabrera having pled guilty

23  to this charge I would feel the same way.  I would feel that

24  the prior sentence is 12 months and 172 days, and, you know,

25  the charge bargain that was entered into had this perverse

1  effect of giving him a mixed message that maybe if he keeps

2  coming at some point we'll give up and he can stay.

3       He can't stay.  And I don't want to hit this hard

4  because I'm not relying on it very hard and I'm relying only on

5  the nature of the convictions here.

6       Again, I've sustained the objection or told Mr. Davis

7  I wouldn't consider the underlying -- the alleged facts that

8  underlie these cases, but these are serious offenses on the

9  face of them, breaking and entering into a place, assault and

10  battery with a dangerous weapon, a threat to commit a crime.

11       At another time, assault with a dangerous weapon.  I

12  mention this to you, Mr. Cabrera, because it's the reason

13  you're disqualified from coming into the United States.  You've

14  never had permission to be here.  You were here illegally from

15  the beginning and any chance you had at least during those

16  years, around 2000, of staying went out the window when you got

17  convicted of those serious offenses.

18       Look, we're the most generous country in the world in

19  terms of allowing people to come in legally.  We admit more

20  people legally into this country as immigrants than any other

21  country in the world, including Germany with the rash of people

22  that they've let in.  But we can't continue to let people in,

23  you know, in a responsible way, exercise our discretion as to

24  who comes in through the front door if people are breaking down

25  the back door and ignoring our rules and coming in.  And I have

1    to say with all respect to you, you've done that.  You've

2    totally ignored these rules.

3         The prosecutor says as far as back as 2007 you made

4    the same pledge to the judge that you've made to me today that

5    this is it, I'm not coming back anymore.

6         And then, you know, the idea that you have to escape

7    oppression in your home country, you know, it's belied by the

8    references the prosecutor called to my attention in paragraphs

9    51 and 56.

10        You lived in Mexico before for substantial periods of

11   time, and I've heard no complaint that anybody in Mexico

12   accosted you or bothered you or that you can't live there.  You

13   speak that language there.  So even what you told me in your

14   allocution about not being able to speak Spanish grammar, well,

15   you speak enough Spanish that you can get by in a Spanish

16   speaking country.

17        The point is this is not your only out if you want to

18   really get out of El Salvador because you're being harassed or

19   oppressed there.  You have plenty of other places you can go.

20        You heard me ask your lawyer, and I think this is

21   true, you can look it up when you get the chance to consult the

22   internet again or publications, I think the president of Mexico

23   has recently said, I'm going to give asylum to all these folks

24   crossing from Central American countries.  But, as I said, with

25   or without asylum, you have lived in Mexico peacefully and

1   without oppression, so it's not true that you have to be in the

2   United States in order to be safe.

3        In my notes, Mr. Davis, before anything was said here

4   I was contemplating a variance of 24 months in this case, that

5   would have taken the sentence up to 60 months.  I'm mindful now

6   of a nonfrivolous argument you've made having to do with COVID.

7        The defendant committed this in November of '19.  We

8   hadn't heard about COVID yet or maybe if we had it was nascent

9   stages of something happening in China.  So this isn't a guy

10  that picked a time during COVID to come in and the variance

11  that you recommend has legs to it where I think if somebody

12  commits an offense, you know, well into the period of the

13  pandemic has been upon us, it doesn't have legs.

14       And you also mentioned that the defendant's actually

15  suffered from the effects of being in custody, closed

16  population, big population, and he contracted COVID while in

17  jail.  I take that into consideration, and I'm moderating the

18  variance that I think is warranted because of that, because of

19  the conditions of confinement.  And the fact that he was in for

20  a long time.  And as you say, even though, you know, it -- I

21  don't think he'd succeed on saying his speedy trial rights were

22  violated, the Olson case pretty much forecloses that, we

23  couldn't try him.  We tried him as quickly as we could and I

24  kept promising him I'd get him a trial date as soon as I could.

25  That's for the trial court to judge.  But it's a factor that I

1    think should be given some weight now that he didn't get to

2    trial right away.

3            I don't know if it would change the ultimate sentence.

4    He's getting credit for all the time he's been in, but I do

5    have those things in mind and I'm going to moderate the -- the

6    variance that I intended to apply in this case.

7            Let me be clear about the basis for the variance, I

8    can take into consideration just punishment here, this is

9    original sentencing, that's one of the 3553 factors.  It's

10   permissible.  In fact, I'm directed to take that into

11   consideration expressly by 3553.

12           I can certainly take into consideration promoting

13   respect for the law.  That's still a permissible factor here.

14   I mentioned those two because they're not permissible factors

15   in -- for a court to consider in imposing any sanction for

16   violation of supervised release.  And I'm mindful that the

17   defendant has additional exposure on that, but I can consider

18   them here.

19           Both of those factors I think support a variance in

20   this case, particularly the deterrence factor.  What's clear to

21   me is the defendant has not been deterred by successive

22   prosecutions, this is now the fourth.  This is now his fourth

23   immigration conviction.  Three felonies, the last three within

24   a matter of, what, six years, five years?  I mean between 2015,

25   2020, he hasn't been deterred.  And, as I said, maybe it's not

1    all his fault.  I think if I was in his position the reduced

2    sentence after 56 months would have given me a mixed message

3    too.

4            I don't want to be cynical about what he says about

5    not coming back anymore, but I have to recognize that he said

6    it before.  I have to recognize that it's not oppression that

7    he's fleeing because he's got other alternatives besides coming

8    into the United States.  That's not the reason he's coming in.

9            But here I find that an 18 month variance from the

10   high end, the high end of 33 months is warranted and I impose a

11   variance upward of 18 months.

12           I find that that's necessary here to achieve the

13   objectives of sentencing under 3553 in this case, given his

14   criminal history, particularly the rash of immigration offenses

15   that have happened in the last five years.

16           So the Court imposes in this case a 51 month sentence.

17   I note that it's lower than the highest sentence he's gotten

18   before, but as I said I was inclined to give him 54 months --

19   I'm sorry, I was inclined to give him 57 months which would

20   have been one month higher than the 56 month, but I have taken

21   into consideration and reevaluated in light of the variance

22   argument made by Mr. Davis.

23           So I find that the 18-month variance to 51 months as I

24   said is warranted for the purpose of deterrence, what I find to

25   be just punishment given this fellow's total criminal history.

1   As I said, I haven't dwelled on the older violent convictions.

2   He says I'm older now, I'm not a violent man.

3          I note that one of the convictions is with a knife and

4   it's the great equalizer, whether you're 50 or 30, you've got a

5   knife in your hand you're very, very dangerous with it as long

6   as you're ambulatory and he certainly is.

7          So I find that 51 months is a reasonable sentence, not

8   longer than necessary, but long enough to achieve the

9   objectives of sentencing for this particular offense.

10          I am aware of the guidance of the sentencing

11   commission that ordinarily a person who is not a citizen of the

12   United States, I can't say anymore likely to be deported, I

13   really can't.

14          There was one point I had confidence that he would

15   certainly be deported.  I don't have that confidence anymore.

16   And that I think adds impetus to my decision to impose a term

17   of supervised release, but I impose it as an additional measure

18   of deterrence.

19          One thing Mr. Cabrera is aware of now is that it's not

20   just the new offense for which he's going to have to answer.

21          Today he's going to have to answer not only for the

22   offense he committed in November of 2019, but for an old

23   offense because he was on release for that offense.  And I

24   wanted him to know that he's on supervised release for three

25   years on this offense.

1          All the ordinary conditions, Tish, are waived.  I'm

2   going to set two specific conditions applicable to this case

3   and to Mr. Cabrera.  One, Mr. Cabrera, don't come back into the

4   United States illegally.  Don't do that.  You want to apply for

5   asylum, you do it from outside the United States, which you can

6   do.  You can go to an embassy.

7          I think there's now provisions being made for you to

8   do so in a place like Tijuana, if that's what your desire is.

9   So don't come back in illegally.

10          Number two, don't violate any United States law.  The

11   Court doesn't impose a fine.  If you move to remit the penalty

12   assessment, Mr. McDonald, I would not impose it here.

13          MR. MCDONALD:  So moved, Your Honor.

14          THE COURT:  No penalty assessment either.

15          Mr. Cabrera, you have a right to appeal your trial and

16   any ruling I made prior to trial and any ruling I made during

17   trial.  You also have a right to appeal your sentence.  If you

18   choose to appeal, you have to exercise your right within the

19   next 14 days.  Mr. Davis is an expert on that and he can tell

20   you exactly what you need to do.

21          Essentially, you just need to tell him you want to

22   appeal and he'll file the notice.  And the grounds for appeal

23   can be determined or perfected later, but 14 days from today

24   you have to make up your mind and tell him if you want to

25   appeal, trial, pretrial motions, sentencing.  Do you

1     understand?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Mr. Davis, anything else on this matter?

4              MR. DAVIS:  Yes, Your Honor, just to lay some

5     objections for the record.

6              First, there's two counts, count two --

7              THE COURT:  Oh, yeah, I'm sorry, I should have

8     mentioned the other one.  I apologize.  Thank you for bringing

9     that to my attention.  I ignored count one.  Yeah, count one

10    was the 1325, punishable by up to two years in custody.

11             The Court imposes 24 months, that sentence to run

12    concurrent.  No point in imposing an additional term of

13    supervised release on that.  I think it -- because it's

14    concurrent, it remains concurrent.  So 24 months concurrent on

15    that count though.  Thank you for reminding me.

16             MR. DAVIS:  And no fine --

17             THE COURT:  Yeah, on that the government moves to

18    remit the penalty assessment?

19             MR. MCDONALD:  Yes, Your Honor.

20             THE COURT:  Yeah.  No fine is imposed on count one and

21    no penalty assessment.

22             MR. DAVIS:  Thank you, Your Honor.

23             THE COURT:  Go ahead.

24             MR. DAVIS:  And just for my objections, Your Honor,

25    procedurally.  I object procedurally to the -- I don't think

1   the Court adequately explained the reason for the extent of the

2   18-month variance as opposed to a lesser term under the

3   parsimony principle.

4        THE COURT:  Let me see if I, I mean, the reason for

5   lodging procedural objections and the requirement to do so at

6   the time of sentencing is to allow me to fix any procedural

7   error.

8        I tried to make it clear that I'm very concerned about

9   deterrence, and it's evident to me that the defendant who was

10  sentenced to 56 months in 2007 was not deterred by that.  I was

11  moved also by the allocution of the defendant in that case

12  where he promised not to come back anymore.  And it's made me

13  insecure about trusting a promise that he makes here.  I'm not

14  always so insecure.  Sometimes people tell me that and I place

15  them on probation or I, you know, give them a limited term and

16  I have every confidence that they won't come back and I have to

17  say many times they don't.

18       But here, I just don't have that confidence, and the

19  defendant's subsequent track record after '07 kind of

20  underscores that.

21       So I really think there's the need for deterrence.  I

22  have -- I don't say this to attack the credibility of

23  Mr. Cabrera, but he just hasn't been good at keeping his

24  promises and you're right, there's no empirical evidence, but

25  common sense tells me that when the consequence is greater, the

1    inclination to engage in the same conduct that results in the

2    consequence lessens.

3         So that's why I -- that's why I've done that in

4    supporting deterrence.

5         MR. DAVIS:  Thank you.

6         THE COURT:  The other reason is, as I said, I'm not

7    accusing him of being violent now, but at least one of the

8    offenses, two of the offenses involved use of a -- of a weapon.

9         One case it was a knife, and as I said, you know, in

10   the hands of an assailant, whether the assailant is 30 or

11   Mr. Cabrera's age, older, a knife is a very dangerous thing and

12   the person is just about as dangerous, maybe not as much but,

13   you know, it would be a nuanced difference to say that a

14   30-year-old with a knife is less dangerous than a 50-year-old

15   with a knife.

16        So those things are also of concern to me and of

17   particular concern is protecting the public.  Do I need to say

18   more or do you think that that's adequate to explain the reason

19   for the 18 month variance?

20        MR. DAVIS:  I'm not going to agree that it's adequate,

21   Your Honor, but I don't have anything else to add on that.

22        THE COURT:  Okay.

23        MR. DAVIS:  And I think I preserved my objection to

24   the Court's calculation of the criminal history which is in

25   my written --

1          THE COURT:  You preserved both of those, so I have

2    those things in mind.

3          Let me turn now to 15-CR-0353.  I think I made a

4    finding -- correct me if I'm wrong when the jury went out that

5    the defendant was in violation.

6          MR. DAVIS:  I don't know if the Court did.  I know

7    that's been the Court's practice sometimes.  But I don't --

8          THE COURT:  Do you remember, Mr. McDonald?  I know I

9    kept saying that while we were postponing both cases that I

10   would make the finding after the jury went out and after giving

11   Mr. Davis and Mr. Cabrera a chance to present anything that

12   might cut against finding him in violation.

13         MR. MCDONALD:  Your Honor, I don't have that at my

14   fingertips, I'm not a hundred percent sure.

15         MR. DAVIS:  I think the Court did not make the

16   finding.  I don't object to the Court taking judicial notice.

17         THE COURT:  Let me make a belt and suspenders approach

18   here.  If I did not, I now find based on the conviction of

19   Mr. Cabrera by the jury, that he was -- he's in violation of

20   the conditions that were set by Judge Lorenz in that he was

21   told not to commit a new violation.  He has committed two new

22   violations, and he was told not to illegally reenter the United

23   States and, of course, that was the charge against him and his

24   conduct amounted to an illegal reentry in my judgment.  So

25   I find that he violated both conditions.

1          I think he faces a sentence of up to 24 months.  His

2    original sentence as I mentioned to you preliminarily,

3    Mr. Davis, was the result of a departure or a variance down to

4    12 months and so now he faces up to 24 months.  The guidelines

5    on this are 6 to 12 months.  I'm happy to hear from you and him

6    on what if any sanction is appropriate.

7          MR. DAVIS:  Your Honor, it's not my practice typically

8    to recommend completely concurrent sentences because I believe

9    that most courts think that some additional punishment is

10   necessary and so I rarely ask for.

11         THE COURT:  Not punishment here.  Remember the

12   nomenclature.

13         MR. DAVIS:  Of course.  Sanction is necessary.  But

14   given the Court's upwards variance from the guidelines in the

15   previous case, the Court sentenced him to four and a half years

16   in prison, I don't -- I think that's enough time for even to

17   sanction him for the supervised release violation.  So my

18   request, obviously I'm asking the Court for the most mitigated

19   sentence that the Court could impose.  I'd ask for a concurrent

20   sentence.

21         THE COURT:  Okay.

22         MR. DAVIS:  And if the Court is not going to do a

23   concurrent, then a minimal amount that will, you know, send him

24   a message that when he's finishing this, you know, four and a

25   half to five years in prison that maybe he'll think, oh, these

1  last few months, these are because of the supervised release

2  violation, but.

3          THE COURT:  All right.

4          MR. DAVIS:  So I'm asking for a concurrent sentence.

5          THE COURT:  Thank you, Mr. Davis.

6          Mr. Cabrera, anything more on this issue of violation

7  of the conditions of supervised release that were imposed in

8  2015 when you were convicted of the same offense?

9          THE DEFENDANT:  No.

10         THE COURT:  Mr. McDonald?

11         MR. MCDONALD:  Your Honor, we submit to the Court.

12         THE COURT:  All right.  As I mentioned, the Court has

13 the discretion to go outside the guidelines on this because the

14 Defendant's original sentence was the result of a departure or

15 a variance.  I don't intend to do that.

16         I did take deterrence into account.  The Court does

17 not take punishment or promoting respect into account.  I

18 realize that those are not applicable factors on this, but

19 there was a breach of trust and it came from a fellow who's

20 pledged trust before, not necessarily in front of Judge Lorenz,

21 but again, did you represent him there in that?

22         MR. DAVIS:  Not in the 15-CR case.

23         THE COURT:  Judge Lorenz's notes make clear that he

24 had granted a downward variance or adjustment.  And he says

25 this in the notes:  The defendant had no serious state

1    conviction for over 15 years, although he did have two federal

2    illegal entries.  He does possess job skills and came from El

3    Salvador where his father was killed, and the defendant had

4    been threatened due to extreme violence in his country.  He

5    plans to live in Mexico.  I assume that that representation

6    came from the defendant or his counsel, he plans to live in

7    Mexico upon his release.

8         The Court considered his lack of criminal history for

9    state violations and ability to be gainfully employed in Mexico

10   and sentenced him to 12 months in custody with two years

11   supervised release as sufficient but not greater than

12   necessary.

13        I glean from that that the defendant did promise that

14   he would live in Mexico.  The Court contemplated that he would

15   stay in Mexico.  So once again there's this idea that this

16   fellow who's been in Mexico, had resided in Mexico before would

17   go back there, thereby averting the perceived threat in El

18   Salvador.  And I think implicit in this was a representation by

19   the defendant that that would work.  It certainly formed a

20   basis for the Court imposing a sentence less than what the

21   advisory guidelines recommended.

22        So I do find there's a breach of trust here and,

23   again, it's kind of consistent with the fact that the defendant

24   had promised in 2007 he wouldn't come back and yet did three

25   more times.  So I think some sanction for the breach of trust

1    is in order.  Again, the Court is entitled to consider

2    deterrence here.

3             I was going to give six additional months before to

4    promote deterrence.  I think that's the correct measure now, it

5    falls within the guideline for the revocation that the -- that

6    the defendant faces, six to 12 months, it's the low end of that

7    guideline.

8             The Court imposes an additional six months in this

9    case to account for the breach of trust on behalf -- or on the

10   part of the defendant.

11            He faces a term of up to 30 months supervised release

12   on this case.  The Court deducts the six months that just was

13   imposed.

14            I don't think -- did I previously impose any sentence

15   on this that needs to be deducted from the remaining supervised

16   release term?  I think this is --

17            MR. DAVIS:  The previously imposed sentence was time

18   served which --

19            THE COURT:  Oh, a hundred and something days?  All

20   right.  I reimpose two years, that subsumes the six months and

21   the 133 days that he previously got for violation.

22            And it's to run concurrent with the term of three

23   years on the new case.  And the two conditions are the same,

24   Mr. Cabrera, listen again, don't come back illegally into the

25   United States, that is without permission of the United States

1    Government and don't violate any United States law.  You'll

2    face a new charge plus two cases if you do that.  Please don't

3    do that.

4            This six month sentence is imposed consecutively to

5    the 51 month sentence I previously imposed, so the total

6    sentence here is 57 months.  I note it's one month longer than

7    the previous length of a sentence for 1326 that the defendant

8    was given.

9            Okay.  Anything --

10           MR. DAVIS:  Yes, Your Honor, can I just make a record

11   as to this case as well?

12           THE COURT:  Yeah.

13           MR. DAVIS:  The document that the Court was reading

14   from with Judge Lorenz's notes, that's not the judgment,

15   correct?

16           THE COURT:  It's a statement of reasons.

17           MR. DAVIS:  Okay.

18           THE COURT:  If you want to look at it, I see no reason

19   why you can't, but the statement of reasons has checked defense

20   motion for sentence outside the advisory and government does

21   not object.

22           Then he checks also nature and circumstances, afford

23   deterrence, protect public.  And then he annotates that with

24   what I read to you.

25           MR. DAVIS:  And the statement of reasons is not

1    publicly filed, correct?

2            THE COURT:  No.  I'm happy to make this statement of

3    reasons part of the record if you prefer.

4            MR. DAVIS:  I guess, my procedural objection is to

5    having the Court rely on it without the parties having reviewed

6    it beforehand.

7            THE COURT:  I'll let you review it right now and we

8    can go over this again.  I read it to you verbatim.  And it's

9    here.  It's a judicially noticeable document and it's available

10   to me.  Would you like to see it?

11           MR. DAVIS:  Sure.

12           THE COURT:  Having reviewed it, Mr. Davis, do you

13   agree that I read it verbatim?

14           MR. DAVIS:  Yes, Your Honor, it appears the Court read

15   it verbatim.

16           THE COURT:  Okay.  You said you wanted to make an

17   additional record on the supervised release?

18           MR. DAVIS:  I think I've made that record, Your Honor.

19   And I don't think I need to object to the substantive

20   reasonableness so.

21           THE COURT:  No, that's preserved on every sentence,

22   substantive reasonableness is.

23           MR. DAVIS:  Right.  May I just say goodbye to

24   Mr. Cabrera?

25           THE COURT:  Of course.  Of course.  Thank you again,

1   both of you, for indulging me.  I'm sorry you missed dinner

2   with your wife.  Thank you too.  I want to thank the probation

3   officer and the two marshals and the interpreter.

4     (The proceedings concluded at 8:14 p.m., November 15, 2021.)

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3        I, CYNTHIA R. OTT, Official Court Reporter, United States

 4   District Court, Southern District of California, do hereby

 5   certify that pursuant to 28 U.S.C. §753 the foregoing is a

 6   true, complete and correct transcript of the stenographically

 7   reported proceedings had in connection with the above-entitled

 8   matter and that the transcript page format is in conformance

 9   with the regulations of the Judicial Conference of the United

10   States.

11

12        DATED December 30, 2021.

13

14                            _____
                                    /s/ CYNTHIA R. OTT
15                            CYNTHIA R. OTT, RDR, CRR

16

17

18

19

20

21

22

23

24

25
```